## 26021. DAY *v.* TRION COMPANY.

DECIDED JUNE 17, 1937.

*Maddox & Griffin,* for plaintiff.
*Maddox, Matthews & Owens,* for defendant.

MACINTYRE, J.  The only question for determination is whether the judge erred in granting a nonsuit in the action brought by Richard F. Day against the Trion Company to recover damages for the homicide of the plaintiff's sixteen-year-old son, Richard Howard Day, hereinafter referred to as the "decedent." The petition as amended substantially avers that the defendant conducted for profit a swimming-pool which, when full, was two and one half feet deep in water at the shallow end and seven and one half feet deep at the other end, with the surface of the water approximately eighteen inches below the level of the floor around the pool; that both the pool and the floor surrounding it were covered with tile; that the pool had been emptied and was "being refilled," and was only three inches deep in water at the shallow end when the accident occurred; that the floor around the pool was very slick when wet, and by reason of the fact that it was glazed tile which did not change color when wet, the decedent "had no knowledge that the

same was wet;" that the pool being made of tile, and the water in it being perfectly clear, the decedent could not tell the depth of the water in it; that the condition of the floor and the pool constituted a "hidden danger which was known to the defendant, . . and it was a breach of duty to petitioner's son to have permitted him to go on said premises under such conditions;" that the decedent paid the customary charge of ten cents for the privilege of using the pool; that "on account of the washing out of said pool . . the floor around the same was wet, and after his said son had put on his bathing suit . . he ran [barefoot] to jump into the pool at the shallow end . . and . . his feet slipped on said floor . . causing him to fall and strike his chest on the edge of said pool and falling into the same, striking the bottom with his neck and shoulders, breaking four ribs, injuring his back and spinal cord," and resulting in his death; that "had the pool been filled with water . . petitioner's . . son would not have been injured in the way and manner set forth, but at most would only have received a slight bruise on his chest, for the reason that same would have broken his fall and he would not have struck the bottom and been injured as he was." The specifications of negligence are: (a) The defendant "failed to exercise ordinary care in keeping its premises safe." (b) "It failed to warn petitioner's son of said dangerous condition of said premises," or (c) "of the slick and dangerous condition of said floor and that said pool was not filled with water." (d) "There was no sign or warning of danger around said pool nor walls of building enclosing the same," and (e) "no . . person in charge to warn . . petitioner's son of said dangerous condition of the floor and that said pool was not filled with water." (f) "In maintaining . . a place of hidden danger where petitioner's son was invited to go." (g) "In constructing, maintaining, and inviting petitioner's son to a pool with a flooring surrounding the same, constructed of tile, and slick." (h) In permitting the decedent to enter the room where the pool was located "without having some one accompany him to warn him and see that he did not get into said hidden danger." (i) In permitting the decedent "to go into said room . . when the water had been withdrawn from said pool and said floor was wet and slick, the same constituting a source of hidden danger."

After testifying, in effect, that the decedent had been in the pool

several times before the time he was killed, and that the water was about twenty-two inches deep where he dived in, the only eye-witness to the accident who was sworn testified in part as follows: "We had got some water on that tile, naturally, and that water was perfectly apparent to anybody that looked. I could see it all right, and in walking around on it I could feel the water with my bare feet. To anybody walking around there it was perfectly apparent that there was water on that tile. . . . If you put water on this floor it would be slicker than it is now. . . I went to the lower edge and went in, dived in the lower end. He came to the edge and stood on the edge for a few minutes, and then dived in. A person standing there looking down into that water could easily have told the depth of that water, could guess it pretty much, and could see the bottom, and could tell pretty nigh the depth of the water. There was nothing concealed there. There was nothing in the pool to prevent ascertaining that. It was perfectly clear of all obstructions. It was perfectly clear. He just stood there poised on the edge like we boys did, and standing there on the edge . . dived in; and that is all he did. I was looking at him when he went in. I didn't see him slip on the edge of the pool—just dived in naturally like the balance of us did. When he went in I heard something sounded like a gun pop when he hit the water, and I knew he was hurt. The Day boy was a pretty good swimmer . . but wasn't such a good diver. . . When we went in they had just begun to fill it up. I couldn't say how long that was before . . Day was hurt, but about twenty to thirty minutes. . . It is filled up with what . . looks like about a six or eight-inch pipe. . . I saw . . Day when he was hurt. The boy, Tobe Anderson, and I and William and them was diving in there, and he dived in too, and he didn't ever come up after he hit the water. . . The fresh water that was being put in was perfectly clear. The color of the tile inside the pool was white, but with the white background it wasn't very hard to distinguish how deep it was along the side. You could tell . . they were filling the pool when we got there, and we didn't wait around until the pool was filled, but went in there. . . [The water] lacked about eight inches of being the depth of what it ordinarily is."

The petition is grounded primarily on the theory that the decedent's death resulted from his slipping on the wet tile floor and

falling into the pool, while the only eye-witness to the accident testified, in effect, that he did not slip and fall in the pool, but that he came to the edge, stood there "for a few minutes," poised, and dived in. It thus appears that the proof differs radically from the pleadings as to the way in which the tragedy occurred. The witness also testified, in effect, that the condition of both the floor surrounding the pool and of the pool itself was plainly visible to any one who might choose to look, and, especially, that one walking on the floor with bare feet, as did the decedent, would have known of its condition. The rules of law applicable to this case were stated in *Coffer* v. *Bradshaw*, 46 *Ga. App.* 143, 149 (167 S. E. 119), as follows: "The duty to keep premises safe for invitees applies to defects or conditions which are in the nature of hidden dangers, traps, and the like, in that they are not known to the invitee and would not be observed by him in the exercise of ordinary care." Our view is that the plaintiff not only failed to prove his case as laid, but that the uncontradicted evidence conclusively showed that by the exercise of very slight care the decedent could have avoided the injury. See *Lebby* v. *Atlanta Realty Corporation*, 25 *Ga. App.* 369 (103 S. E. 433); *Hendricks* v. *Jones*, 28 *Ga. App.* 335 (111 S. E. 81); Walloch *v.* Heiden, 180 Ark. 844 (22 S. W. 2d. 1020). The court did not err in granting a nonsuit.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*